| | | |
|---|---|---|
| ALLIED WASTE TRANSPORTATION, INC., | ) ) ) | |
| Plaintiff / Counter-defendant, | ) ) | No. 13 C 01029 |
| v. | ) ) ) | Judge Edmond E. Chang |
| BELLEMEAD DEVELOPMENT CORP., *et al.*, | ) ) ) ) | |
| Defendants / Counter-plaintiffs. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Allied Waste Transportation, Inc. and Defendant John Sexton Sand & Gravel Corporation are members of a partnership formed to operate a sanitary landfill in Hillside, Illinois. Allied filed this action against Sexton and two of its executives: Sexton's Director of Operations, Todd S. Daniels, and Sexton's President, Arthur A. Daniels. The cleaning-up and closing of the facility ended up costing millions of dollars more than anticipated, with Allied bearing the brunt of the costs. In this suit, Allied wants to recover response costs incurred in closing and monitoring the facility under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq*. R. 44, First

Am. Compl ¶ 1.[1] Allied also filed a separate count against Sexton alleging breach of the partnership agreement.[2] *Id.*

Sexton argues that Allied's exclusive remedy under the partnership agreement for Sexton's admitted failure to contribute to cleanup costs is adjustment of Sexton's partnership interest. R. 46, Sexton's Answer at 25-26. Alternatively, Sexton argues that Allied's claims for damages are not ripe because there has been no final partnership accounting. *Id.* at 27-28. Todd and Arthur Daniels[3] argue that they are agents of the partnership, and Allied is barred from seeking recovery against them under the partnership agreement and agency principles for acts taken within the scope of the agency. R. 47, A. Daniels's Answer at 24; R. 48, T. Daniels's Answer at 25. Both Sexton and Daniels filed counterclaims for breach of the partnership agreement based on Allied's refusal to indemnify Sexton and Daniels for liability, including attorneys' fees, arising from this action. Sexton's Answer at 30-31; A. Daniels's Answer at 27-28; T. Daniels's Answer at 28-29. Sexton and the Daniels now move for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). R. 62, Sexton's Mot. J. Pleadings; R. 65, Daniels's Mot. J. Pleadings. For the reasons stated below, the motions are denied.

---

[1] Allied also filed tort and CERCLA counts against Bellemead Development Corp., which are not relevant to the motions for judgment on the pleadings decided in this Order. First Am. Compl. ¶¶ 58-78.

[2] The Court has subject matter jurisdiction over the federal claims under federal question jurisdiction, 28 U.S.C. § 1331, and supplemental jurisdiction over the closely related state law claims, 28 U.S.C. § 1367.

[3] For convenience's sake, most of the time, this Order will refer to Defendants Todd Daniels and Arthur Daniels as just a singular "Daniels"—their arguments are the same.

2

# I. Background

## A. The Partnership

In 1980, Sexton and Browning-Ferris Industries of Illinois, Inc. formed a general partnership called Congress Development Company (CDC). First Am. Compl. ¶¶ 10-11. The purpose of the partnership was to own and operate a landfill in Hillside, Illinois. *Id. See also* R. 44-1, Pl.'s Exh. A, Partnership Agreement at § 1.02. Sexton and Browning-Ferris agreed that Sexton would operate and manage the landfill on CDC's behalf. Partnership Agreement at § 1.09(l). As officers of Sexton, Todd and Arthur Daniels were involved in Sexton's operation of the landfill. First Am. Compl. ¶¶ 30-31. On September 22, 1999, Browning-Ferris assigned its interest in CDC to Allied with Sexton's consent. *Id.* ¶ 18. Sexton continued to operate the landfill until February 2007, when the partners amended the agreement to designate Allied as the operator of the landfill. *Id.* ¶ 19.

Sexton and Browning-Ferris initially contributed equal capital to the partnership and each owned fifty percent of CDC. First Am. Compl. ¶ 12; Partnership Agreement at § 2.01(a)-(b). Under Section 2.01 of the Partnership Agreement, CDC would first generate any additional needed capital by arranging a line of credit. Partnership Agreement at § 2.01(d). If credit was not available, each partner would contribute the additional capital equally. *Id.* at § 2.01(e). If one partner failed to contribute its equal share of additional capital, the partners agreed that "the interests of the Partners shall be adjusted" to reflect each partner's relative contribution. *Id.* In the original partnership agreement, the partners also

agreed to share the profits and losses of CDC "according to their interests in the Partnership at the time of the determination of the profits and losses." *Id.* at § 2.02. The partnership interests remained equal until around February 2007. First Am. Compl. ¶ 12.

In addition to sharing profits and losses, the partners agreed to share liability for "any and all judgments, claims or penalties against the Partnership or either of the Partners or the Operator, and their respective officers, directors, employees and agents." Partnership Agreement at § 9.03. Under Section 9.03, partners "shall be jointly liable for and shall share equally in" any liability, including attorneys' fees, incurred on behalf of the partnership. *Id.* The partners would not share liability for an actor's "acts of wilful misconduct, gross negligence[,] or reckless disregard of its or their duties and responsibilities." *Id.*

### B. Environmental Cleanup

As a result of CDC's operation of the landfill, hazardous substances were released into the leachate and groundwater of the landfill site. First Am. Compl. ¶¶ 26-28. On January 26, 2006, the State of Illinois filed suit against CDC. The State alleged that CDC and the partners violated "various statutes and regulations and the terms of the Clean Air Act." *Id.* ¶¶ 39-40. CDC ultimately settled the case with the State in 2010. *Id.* ¶ 41. Under the settlement agreement, CDC was required to pay the State $1 million in penalties and $200,000 in costs. *Id.* Allied claims that it paid these expenses without any contribution from Sexton. *Id. See also* Sexton's

4

Answer at 14-15 ("Sexton states that it was never asked to contribute to the settlement but admits it did not contribute.").

The Village of Hillside also sued CDC based on the operation of the landfill. First Am. Compl. ¶ 33. On March 9, 2007, CDC and the partners entered into an Agreed Order with the Village, under which the parties agreed that the landfill would stop accepting solid waste by June 15, 2008. *Id.* ¶ 34. Under the Agreed Order, CDC was required to compensate the Village of Hillside for "continued oversight, inspection, and consultation related to" the closure of the landfill. *Id.* ¶ 34. Allied claims that these expenses totaled more than $1 million. *Id.* ¶ 35. Allied paid the Village of Hillside without contribution from Sexton. *Id. See also* Sexton's Answer at 13 ("Sexton states that it was never asked to contribute to the Village payments set forth in the Agreed Order but admits it did not pay any of them.").

A month later, Samuel J. Roti, owner of a neighboring hotel, sued CDC, alleging that the odors from the landfill harmed the hotel's profitability. First Am. Compl. ¶¶ 36-37. CDC and the partners settled the lawsuit in November 2009. *Id.* ¶ 38. Allied again alleges that it paid all of the settlement costs (at least those not covered by insurance) without contribution from Sexton. *Id.* In addition to these settlement costs, Allied has paid all of CDC's expenses related to complying with federal and state statutory requirements, investigating the release of hazardous substances, and remediating any release of hazardous substances. *Id.* ¶¶ 53-55. *See also* Sexton's Answer at 18-19 ("Sexton has remained unable to contribute its share

of the losses."). Allied claims that, since 2007, these expenses have totaled nearly $125 million. First Am. Compl. ¶ 53.

After CDC settled with the State of Illinois, Hillside, and Roti, Allied and Sexton executed an amendment to the partnership agreement. *See* Partnership Agreement at Fifth Amendment. The amendment acknowledged that Sexton failed to contribute its one-half share of capital contributions and stated that the partners' interests had been adjusted accordingly. *Id.* at Fifth Amendment ¶ 14. Though the partners' interests were adjusted, the partners added the following provision to the end of Section 2.01(e):

> The adjustment of the Partners' interests shall not, in any way, reduce or eliminate the obligations of each Partner to contribute its one-half share of all additional capital required by the Partnership under this Section 2.01(e) of the Agreement, and to pay its one-half share of judgments, claims or penalties as provided in Section 9.03 of the Agreement.

*Id.* at Fifth Amendment ¶ 3. The parties also changed the allocation of profits and losses. Under the amended Section 2.02, the partner that fails to contribute its share of capital must bear a higher proportion of losses until both partners receive the net losses "equal to what they would have received had both Partners contributed the additional capital as and when required under the terms of this Agreement." *Id.* ¶ 4.

### C. The Present Action

In February 2013, Allied filed this lawsuit against Sexton, Todd Daniels, and Arthur Daniels. R. 1, Compl. Allied alleges that Sexton violated Section 9.03 of the Partnership Agreement when it failed to contribute to the environmental cleanup

6

costs incurred by CDC. First Am. Compl. ¶¶ 92-98. Allied also seeks contribution for cleanup costs from Sexton and the Daniels under CERCLA. *Id.* ¶¶ 79-91.

Shortly after Allied filed suit, Sexton and the Daniels sent letters to Allied, asking Allied to share equally in paying all "liability, damage, or penalties" and attorneys' fees that might arise from Allied's suit against the defendants. R. 46-1, Sexton's Exh. A, June 4, 2013 Letter; R. 47-1, A. Daniels's Exh. A, June 4, 2013 Letter; R. 48-1, T. Daniels's Exh. A, June 4, 2013 Letter. Based on these letters, Sexton and Daniels filed counterclaims, asserting that Allied violated the Partnership Agreement by refusing to indemnify the defendants for any liabilities arising from of Allied's own lawsuit against them. Sexton's Answer at 30-31; A. Daniels's Answer at 27-28; T. Daniels's Answer at 28-29. Because Sexton's and Daniels's responsibility to contribute depends on interpretation of the Partnership Agreement and related questions of law, Sexton and the Daniels now move for judgment on the pleadings. *See* Sexton's Mot. J. Pleadings; Daniels's Mot. J. Pleadings.

## II. Standard of Review

A party may move for judgment on the pleadings after the pleadings are closed. Fed. R. Civ. P. 12(c). A motion for judgment on the pleadings is subject to the same standard as a motion to dismiss under Rule 12(b)(6). *Hayes v. City of Chicago*, 670 F.3d 810, 813 (7th Cir. 2012). In ruling on a motion for judgment on the pleadings, the Court must accept all well-pled allegations as true and view the alleged facts in the light most favorable to the non-moving party. *Emergency Servs.*

7

*Billing Corp. v. Allstate Ins. Co.*, 668 F.3d 459, 464 (7th Cir. 2012). Judgment on the pleadings is proper if it appears beyond a doubt that the non-moving party cannot prove any set of facts sufficient to support his claim for relief. *Hayes*, 670 F.3d at 813. In ruling on a motion for judgment on the pleadings, the Court considers the pleadings alone, which consist of the complaint, the answer, and any documents attached as exhibits (so long as the exhibits do not require fact-finding over a disputed point). *N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 452 (7th Cir. 1998).

### III. Analysis

Under CERCLA, a party responsible for the release of hazardous substances is strictly liable for cleanup costs and other related expenses. 42 U.S.C. § 9607(a) . A responsible party that has paid more than its share of costs may seek contribution from other responsible parties. 42 U.S.C. § 9613(f). *See also PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 615 (7th Cir. 1998). Though CERCLA prohibits any agreements that would divest a responsible party of liability, 42 U.S.C. § 9607(e)(1), the statute permits parties to allocate cleanup costs among themselves by agreement. *See LaSalle Nat'l Trust, N.A. v. ECM Motor Co.*, 76 F.3d 140, 144 (7th Cir. 1996) (citing *Harley-Davidson, Inc. v. Minstar, Inc.*, 41 F.3d 341, 342 (7th Cir. 1994)). Interpreting a cost-allocation agreement between parties "depends simply on the wording of the agreement interpreted in light of applicable state law governing indemnification agreements." *Harley-Davidson*, 41 F.3d at 344.

In their affirmative defenses and counterclaims, Sexton and Daniels argue that the partnership agreement limits their liability for CERCLA contribution costs. *See* Sexton Answer; T. Daniels's Answer; A. Daniels's Answer. By its terms, the partnership agreement is governed by Illinois law. Partnership Agreement at § 9.05. Resolving the questions presented by the motions for judgments on the pleadings thus depends on Illinois rules of contract interpretation.

Under Illinois law, the "primary objective in construing a contract is to give effect to the intent of the parties." *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007). This principle requires that courts interpret contracts "as a whole, viewing each part in light of the others." *Id.* Illinois follows the "four corners" rule of contract interpretation, which requires that a court initially look to the language of a contract alone. *Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E. 2d 882, 884 (Ill. 1999). "If the language of the contract is facially unambiguous, then the contract is interpreted by the trial court as a matter of law without the use of parol evidence." *Id.* But if "the trial court finds that the language of the contract is susceptible to more than one meaning, then an ambiguity is present." *Id.* Only where an ambiguity is present may extrinsic evidence be allowed to aid the trier of fact. *Id.* With these principles in mind, the Court addresses the affirmative defenses and counterclaims of the moving defendants in turn.

### A. Sexton's Affirmative Defenses

In response to Allied's claim that Sexton is required to contribute cleanup costs under CERCLA and the Partnership Agreement, Sexton argues that Allied's

9

sole remedy under the Partnership Agreement is adjustment of the partners' interests in CDC. R. 63, Sexton's Br. at 8. Sexton bases this argument on Section 2.01(e) of the Partnership Agreement, which states that a partner's interest "shall be adjusted" if the partner fails to contribute its share of needed capital. *Id. See also* Partnership Agreement at § 2.01(e). Sexton argues that the use of the word "shall" in the provision and the agreement's integration clause unambiguously create an exclusive remedy for failure to contribute to the partnership. Sexton's Br. at 8-10.

Although contract provisions limiting the remedies of the parties are enforceable under Illinois law, these provisions must be "strictly construed."[4] *Hicks v. Airborne Express, Inc.*, 858 N.E.2d 48, 54 (Ill. App. Ct. 2006). Parties are not required to include all potential remedies in their written agreement in order to make those remedies available, and specifically providing for a particular remedy will *not* necessarily preclude other available remedies. *Brian McDonagh S.C. v. Moss*, 565 N.E.2d 159, 161 (Ill. App. Ct. 1990). A remedy provision should be found to be exclusive when "the contract as a whole warrants such a construction," even if the contract does not include the word "exclusive." *Intrastate Piping & Controls, Inc. v. Robert-James Sales, Inc.*, 733 N.E.2d 718, 724 (Ill. App. Ct. 2000). *See also O'Shield v. Lakeside Bank*, 781 N.E.2d 1114, 1119 (Ill. App. Ct. 2002); *Omnitrus*

---

[4]Some cases suggest that an exclusive-remedy provision must "clearly indicate that the intent of the parties was to make the stipulated remedy exclusive." *Bd. of Regents v. Wilson*, 326 N.E.2d 216, 220 (Ill. App. Ct. 1975). *See also Lake Cnty. Trust Co. v. Two Bar B, Inc.*, 53 N.E.2d 1015, 1019 (Ill. App. Ct. 1989). But other cases (including the ones cited in the text) do not explicitly apply a clear-statement requirement. Even assuming that there is no clear-statement requirement, here the plain language of the Partnership Agreement does *not* create an exclusive remedy. So it is not necessary for the Court to decide whether there really is a clear-statement requirement under Illinois law.

10

*Merging Corp. v. Illinois Tool Works, Inc.*, 628 N.E.2d 1165, 1168 (Ill. App. Ct. 1993).

Based on the contract's unambiguous plain language, the partnership-adjustment clause is *not* an exclusive remedy for failure to contribute to the partnership. In full, Section 2.01(e) reads:

> To the extent additional capital is required by the Partnership but is unobtainable pursuant to subsection (d), each Partner shall contribute additional capital equally. If either Partner does not make its contribution within 90 days after the date such contribution is agreed by the Partners to be due, the interests of the Partners shall be adjusted so that the percentage interest of the Partner making the contribution shall equal the sum of the value of its initial capital contribution plus the additional contributions made to the Partnership divided by the total of capital contributions by both Partners (including the additional contributions).

Partnership Agreement at § 2.01(e). There is no language in this provision or any other provision of the Partnership Agreement that justifies reading the adjustment provision as an exclusive remedy. Sexton argues that because the provision uses the mandatory word "shall" and mentions no other remedy, adjustment is exclusive. Although the use of the word "shall" certainly means that the partnership adjustment is mandatory, *see Weill v. Centralia Service & Oil Co.*, 51 N.E.2d 345, 347 (Ill. App. Ct. 1943), it does not, without more, create an *exclusive* remedy. Nor does the partners' failure to include other forms of relief in Section 2.01(e) demonstrate an intent to preclude additional remedies. *See Brian McDonagh*, 565 N.E.2d at 161. The text of Section 2.01(e) does not come close to approaching the conclusiveness of the text that Illinois courts have found, in prior cases, to create exclusive remedies. *See Moody v. Fed. Express Corp.*, 858 N.E.2d 918, 921-22 (Ill.

11

App. Ct. 2006) (holding that a contract that limited liability to the lesser of actual damages or $100 and expressly disclaimed liability for direct, incidental, special, or consequential damages in excess of the limited amount provided an exclusive remedy); *Hicks*, 858 N.E.2d at 48, (holding that a contract that provided a specific remedy if a package does not arrive on time and expressly disclaimed liability for any additional special, incidental, or consequential damages was exclusive); *O'Shield*, 781 N.E.2d at 1118 (holding that a contract stating that return of earnest money was the purchaser's "sole remedy" created an exclusive remedy); *Omnitrus*, 628 N.E.2d at 1167 (holding that a contract that provided that an enumerated remedy "is exclusive of any other rights or remedies" created an exclusive remedy). *See also CogniTest Corp. v. Riverside Publ'g Co.*, 107 F.3d 493, 495-97 (7th Cir. 1997) (holding that, under Illinois contract law, a contract that had a specific liquidated damages claim coupled with a clause that disclaimed liability for lost profits, special, contingent, incidental, and consequential damages created and exclusive remedy).

Sexton's reliance on the integration clause adds nothing. Under the integration clause, the partners agree that the written contract represents "the entire agreement of the parties." Partnership Agreement at § 9.07. When parties include an integration clause, "they are explicitly manifesting their intention to protect themselves against misrepresentations which might arise from extrinsic evidence." *Air Safety*, 706 N.E.2d at 885. By including an integration clause, the partners do not modify the express language of their written agreement; they

12

reinforce the principle that their intent should be interpreted based solely upon the plain language of that agreement. Therefore, the integration clause does not change the plain language of Section 2.01(e), which, on its face, does not create an exclusive remedy.

Sexton can point to no other language in Section 2.01(e) or any other provisions in the contract that would warrant the conclusion that the Partnership Agreement sets forth the exclusive remedy for a partner's failure to contribute to the partnership. Sure, the language of Section 2.01(e) unambiguously states a remedy for a partner's failure to contribute its capital share, but that is as far as it goes: its plain language, even when coupled with the language of the contract as a whole, does not make that remedy exclusive.

Sexton also argues that even if Section 2.01(e) does not create an exclusive remedy, Allied's claims are not "ripe" because there has been no final partnership accounting. Sexton's Br. at 12-13. In Illinois, generally speaking, "one partner may not maintain an action against another partner until there has been a settlement of the partnership affairs."[5] *Schlossberg v. Corrington*, 400 N.E.2d 73, 76 (Ill. App. Ct. 1980). Illinois generally requires a full partnership accounting "in order to ascertain

---

[5]Neither Sexton nor Allied cited to § 405 of the Illinois Partnership Act, which provides that "[a] partner may maintain an action against the partnership or another partner for legal or equitable relief, with or without an accounting as to partnership business" if the action is to "enforce the partner's rights under the partnership agreement," "enforce the partner's rights under the [Illinois Partnership Act]," or "enforce the rights and otherwise protect the interests of the partner, including rights and interests arising independently of the partnership relationship." 805 ILCS 206/405(b). This provision appears to apply to the Partnership Agreement. 805 ILCS 206/1206(b). In any event, the Court need not decide if this statutory provision applies, because a common-law exception applies and there is no need for an accounting, as discussed above.

13

that the partner who claims some amount from his co-partner is not in fact liable to his co-partner in connection with some other partnership debt." *Nussbaum v. Kennedy*, 642 N.E.2d 151, 155 (Ill. App. Ct. 1994). There are, however, "numerous exceptions to the general rule." *Balcor Income Prop., Ltd. v. Arlen Realty, Inc.*, 410 N.E.2d 612, 613 (Ill. App. Ct. 1981). One exception is that no accounting is required when "the plaintiff's claim can be decided without a full review of the partnership accounts." *Id.* at 614.

In this case, no accounting is required to decide Allied's claims against Sexton. In the Fifth Amendment to the partnership agreement, the partners agreed on the amount of capital contributions that Allied made without contribution from Sexton. *See* Partnership Agreement at Fifth Amendment ¶ 14. *See also* First Am. Compl. ¶ 24; Sexton's Answer at 9. Sexton does not dispute that it has failed to contribute to the cleanup costs associated with the landfill and related judgments. *See* First Am. Compl. ¶¶ 25, 35, 38, 41, 53-55; Sexton's Answer at 9, 13-15, 18-19. Accepting Allied's well-pled allegations as true leads to the conclusion that Allied has contributed all costs on behalf of CDC that were not paid by insurance. There is no obstacle to ascertaining the amount that Allied claims Sexton owes. A full partnership accounting is therefore not required to decide Allied's claim.

Because the plain language of the Partnership Agreement does not create and exclusive remedy and no partnership accounting is required to proceed with this suit, Sexton's motion for judgment on the pleadings regarding its affirmative defenses must be denied.

14

Next up is Daniels's motion for judgment on the pleadings.[6] Daniels argues that Allied is barred from seeking contribution from him under Section 9.03 of the partnership agreement. Daniels reasons that, because he was acting as agents of CDC within the scope of partnership business, Section 9.03 requires Allied to indemnify him for "any and all judgments, claims or penalties" against them. Partnership Agreement at § 9.03; R. 66, Daniels's Br. at 8. Allied argues that Section 9.03 does not apply to its claim against Daniels for two reasons. First, Section 9.03 only requires indemnification for claims against agents brought by *nonparties* to the Partnership Agreement. R. 75, Allied's Resp. to Daniels at 3-4. Next, Section 9.03 does not apply to claims for contribution under CERCLA. *Id.* at 5-6.

Although Daniels is correct that indemnification agreements may include claims by parties to the agreement (what they call "first party claims"), *see* Daniels's Br. at 8, whether a particular indemnification agreement actually does cover claims by a party depends on the language of the agreement. By its unambiguous, plain language, Section 9.03 does *not* require indemnification for claims made by a party to the Partnership Agreement. Under Section 9.03,

> Partners shall be jointly liable for and shall share equally in the payments of any and all judgments, claims or penalties *against* the Partnership or either of the Partners or the Operator, and their respective officers, directors, employees and agents, for an on account of any liability, damage or penalties incurred by reason of any act or omission by or on behalf of the Partnership within the purposes set forth in Section 1.02 …

---

[6] Remember that, for convenience's sake, this Order often refers to the two Daniels Defendants collectively as the singular Daniels.

15

Partnership Agreement § 9.03 (emphasis added). Two points demonstrate that this provision applies only to nonparty claims. The first is that the indemnification provision applies to claims "against" the Partnership or its agents, and the provision says nothing about claims filed "by" the Partnership or its agents. Second, interpreting the provision as Daniels suggests would yield a circular and illogical result. If this provision were to apply to claims by a party to the contract, a partner suing another partner would be required to contribute to the other for liabilities and attorneys' fees arising from its own cause of action. The partner would have to "share equally" in a payment owed to *itself*. So the indemnifying party could then seek contribution against the party that it just indemnified under the same provision. And so on. Because Section 9.03 provides for mutual contribution by the partners, applying the provision to claims against partners and their agents by the partners themselves would result in an unending feedback loop of contribution. The only reasonable construction of the plain language of Section 9.03 is that the partners agreed to indemnify each other and their agents, employees, and officers against claims brought by *non*parties to the agreement.

The cases cited by Daniels do not suggest a different result. In all of the cited cases, the indemnification agreement between the parties ran in *one* direction. *See Harley-Davidson*, 41 F.3d at 341 (interpreting an agreement in which the buyer of a manufacturing plant agreed to indemnify the seller); *Ins. Co. of N. America v. Elgin, Joliet & Eastern Rwy. Co.*, 229 F.2d 705, 707 (7th Cir. 1956) (interpreting an agreement in which the lessor of a crane agreed to indemnify the lessee for any

16

property damage connected to the crane's use); *Olin Corp. v. Consolidated Aluminum Corp.*, 5 F.3d 10, 12 (2d Cir. 1993) (interpreting an agreement in which the buyer of an aluminum plant agreed to indemnify the seller); *Water Tower Realty Co. v. Fordham 55 E. Superior LLC*, 936 N.E.2d 1127, 1129-30 (Ill. App. Ct. 2010) (interpreting an agreement in which a property owner that was starting extensive construction agreed to indemnify a neighboring property owner for any loss or liability related to the construction). Unlike the *mutual* contribution agreement at issue in this case, one-way indemnification agreements do not suffer from the circularity discussed above when interpreted to include claims by parties to the agreement. Because only one party has agreed to indemnify the other, one-way indemnity agreements will not result in back-and-forth claims for indemnity if applied to party claims. Therefore, the cases interpreting one-way indemnification agreements do not shed light on how to interpret a *mutual* indemnity agreement, which is what this case is about. The only reasonable way to read the plain language of Section 9.03 is to exclude claims by parties to the agreement. Because the provision does not apply to party claims like the one at issue here, there is no need to address whether Section 9.03 applies specifically to claims for CERCLA contribution.

Daniels alternatively argues that Allied must indemnify him under traditional principles of agency law. Daniels's Br. at 11-13. Daniels invokes the doctrine of respondeat superior to assert that "a principal is liable for the tortious acts of an agent committed within the scope of the agency." *Id.* at 11 (citing *Adames*

17

*v. Sheahan*, 909 N.E.2d 742, 754-55 (Ill. 2009)). This is a correct statement of the principle of respondeat superior, but it does not help Daniels here. Under the doctrine of respondeat superior, a principal will be liable to *third*-parties for the acts committed by its agents within the scope of the agency. Respondeat superior does *not* concern the allocation of liability between the principal and the agent.

Daniels's reliance on the Restatement (Third) of Agency is similarly flawed. The Restatement's requirement that a principal indemnify an agent applies to claims against *third*-parties. *See* Restatement (Third) of Agency § 8.14 cmts. b, d. *See also Hollingsworth v. Perry*, 133 S.Ct. 2652, 2667 (2013) (describing the Restatement provision as requiring the principal to indemnify the agent for losses incurred by the agency in "defending against actions brought by third parties"). The agency principles cited by Daniels, like Section 9.03 of the Partnership Agreement, do not apply to claims asserted by one of the partners. Because these principles do not apply to party claims, there is no need to address Allied's arguments that the Partnership Agreement trumps the common law or that respondeat superior does not apply to claims under CERCLA.

Neither Section 9.03 nor the agency principles cited by Daniels apply to the claims by Allied. Therefore, Daniels's motion for judgment on the pleadings regarding its affirmative defenses must be denied.

### C. Sexton's and Daniels' Counterclaims

In addition to their affirmative defenses, Sexton and the Daniels assert counterclaims against Allied for breach of the partnership agreement. Sexton's

18

Answer at 30-31; A. Daniels's Answer at 27-28; T. Daniels's Answer at 28-29. [7] Sexton and the Daniels allege that Allied violated Section 9.03 of the partnership agreement by refusing to indemnify the defendants for any liabilities arising from Allied's lawsuit against them. *Id.* For the reasons discussed above, Section 9.03 does not apply to claims by a party to the Partnership Agreement. Because Section 9.03 does not apply to Allied's claims against Sexton and its agents, Allied could not breach that agreement by refusing to indemnify Sexton and its agents for liabilities and fees arising from these claims. The motions for judgment on the pleadings regarding Sexton's and Daniels's counterclaims must therefore be denied.

### IV. Conclusion

For the reasons discussed above, Sexton's motion for judgment on the pleadings is denied, and Daniels's motion for judgment on the pleadings is denied.

ENTERED:

      s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 8, 2014

---

[7] The Daniels Defendants allege that they are able to enforce the partnership agreement as third-party beneficiaries. *See* Daniels's Br. at 13. For the purposes of the motion for judgment on the pleadings, Allied does not dispute that the Daniels Defendants may enforce the partnership agreement. Allied's Resp. to Daniels at 8.

19