# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| Allied Waste Transportation, Inc., | |
| Plaintiff, | Case No. 13 C 1029 |
| v. | |
| John Sexton Sand & Gravel Corp., *et al.*, | Judge John Robert Blakey |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

This matter concerns a dispute over the payment of expenses for the clean-up and closing of a landfill in Hillside, Illinois. Plaintiff Allied Waste Transportation, Inc., and Defendant John Sexton Sand & Gravel Corporation are partners in the Congress Development Company ("CDC"), which was formed in 1980 to develop and operate a landfill at the Hillside Quarry. Allied brought this action against Sexton and two of its executives: Todd and Arthur Daniels (collectively referred to as "the Daniels"). Seeking to recover the costs incurred in cleaning, closing and monitoring the landfill, Allied filed the following causes of action: (1) a claim for cost recovery against all Defendants under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") (Count III); and (2) a breach of contract claim against Defendant Sexton (Count IV).[1] Both Sexton and the Daniels filed counterclaims for breach of contract based upon Allied's refusal to indemnify Sexton and Daniels for liability, including attorneys' fees, arising from this action.

---

[1] Counts I and II were alleged against Bellemead Development Corp., who settled with Allied and is no longer in this case. The claims against Bellemead are not relevant to the Court's analysis here.

1

Currently before the Court are cross motions for summary judgment by Allied [228], Sexton [220] and the Daniels [224]. As explained below, those motions are granted in part and denied in part.

## I. Background[2]

The CDC is a partnership between Allied and Sexton that ran a landfill in Hillside, Illinois, from 1980 until its closure in 2008. DSOF ¶ 11. The landfill site is a 75-acre parcel, of which 55 acres were used for waste disposal. PSOF ¶ 47. The Partnership Agreement establishing the CDC was executed on or around May 15, 1980. PSOF ¶ 67. The original partners, Sexton and Browning-Ferris Industries of Illinois, Inc., initially contributed equal capital to the partnership and each owned fifty percent of CDC. First Am. Compl. ¶ 12. On September 22, 1999, Browning-Ferris assigned its interest in CDC to Allied with Sexton's consent. *Id*. at ¶ 18. Allied thus took a 50% interest in the Partnership.

One part of the present dispute concerns the parties' required capital contributions to the partnership. The contribution of capital to the partnership is governed by Section 2.01 of the Partnership Agreement. Under that section, CDC would first generate any additional needed capital by arranging a line of credit. Partnership Agreement § 2.01(d). If credit was not available, each partner would contribute the additional needed capital equally. *Id*. at § 2.01(e). If one partner failed to contribute its equal share of additional capital, the partners agreed that

---

[2] The facts are taken from the parties' Local Rule 56.1 statements. "DSOF" refers to the Daniels' statement of facts [226], with Allied's responses where applicable [244]. "PSOF" refers to Plaintiff's statement of facts [228], with Defendants' responses where applicable [238]. SSOF refers to Sexton's statement of facts [222], with Allied's response where applicable [242].

"the interests of the Partners shall be adjusted" to reflect each partner's relative contributions. *Id*. Relatedly, the partners agreed to share the profits and losses of CDC "according to their interests in the Partnership at the time of the determination of the profits and losses." *Id*. at § 2.02. As will be discussed in greater detail below, the partnership interests remained equal until around February 2007. First Am. Compl. ¶ 12.

In addition to sharing profits and losses, the partners agreed to share liability for "any and all judgments, claims or penalties against the Partnership or either of the Partners or the Operator, and their respective officers, directors, employees and agents." Partnership Agreement at § 9.03. Section 9.03 requires that the partners "shall be jointly liable for and shall share equally in" any liability, including attorneys' fees, incurred on behalf of the partnership. *Id*. The partners would not share liability for an actor's "acts of willful misconduct, gross negligence[,] or reckless disregard of its or their duties and responsibilities." *Id*.

As to the actual operation of the landfill, Section 1.09 of the Partnership Agreement provides that CDC shall hire an operator "to manage all operations related to the Partnership purpose." SSOF ¶ 12. The partners agreed that Sexton would act on CDC's behalf as the operator, and "conduct the day-to-day management of the operation of the sanitary landfill." *Id*. at ¶¶ 12, 15. Arthur Daniels is the President of Sexton, and Todd Daniels is the Director of Operations. *Id*. at ¶ 17. That makes Arthur an Officer of the company, and Todd an employee. *Id*. Arthur and Todd were not parties to the Partnership Agreement. *Id*. at ¶ 18.

The exact responsibilities of Todd and Arthur are much debated by the parties here, and will be addressed in more detail in the body of this Opinion.

From 1980 until 2007, Sexton operated the CDC landfill on behalf of the Partnership under the terms of Section 1.09 of the Agreement. *Id*. During the time Sexton operated the landfill, it had responsibility for overall management of the landfill, a responsibility which encompassed day-today decision-making with respect to compliance with environmental regulations. *Id*. at ¶ 46.

Prior to 2005, the landfill was profitable and the profits that were distributed amongst the partners were split on a 50/50 basis. SSOF ¶ 8. In 2006, the landfill began experiencing problems at the site with hazardous materials in the gas and leachate. Leachate is a solution that results from the leaching of soluble matters from the landfill into the groundwater. In 2006, acetone, xylene, benzene, toluene, and ethylbenzene were detected in groundwater and leachate at the site. PSOF ¶¶ 5-6. By April 25, 2006, landfill gas had migrated through the subsurface of the landfill and off the landfill site. PSOF ¶ 12. On September 28, 2006, leachate ran through a drainage ditch and collected in a sediment basin on the site. PSOF ¶ 7. On October 1, 2006, leachate – mixed with surface water – flowed to the sediment basin located on the northeast corner of the landfill. PSOF ¶ 8. On October 16, 2006, leachate discharged onto the surface and flowed to the northeast corner of the site. PSOF ¶ 9. Landfill gas samples collected at the site indicated that the landfill gas contained acetone, xylene, benzene, toluene, ethylbenzene, and methyl mercaptan. PSOF ¶ 10. Ambient air monitoring documented landfill gas emissions

exceeding emission limits from January to May and July to November, 2006. PSOF ¶ 13.

On January 20, 2006, the State of Illinois initiated a lawsuit against CDC in the Circuit Court of Cook County, Illinois. That lawsuit was captioned *People of the State of Illinois v. Congress Development Company, et. al*, and alleged, among other things, that the gas released from the CDC landfill posed a threat to human health and the environment. PSOF ¶ 25. On January 26, 2006, the Cook County Circuit Court entered the first preliminary injunction in that matter, requiring CDC to take action to control the release of gas from the landfill. PSOF ¶ 73. Since at least that time, CDC's expenses have exceeded its revenues. PSOF at ¶ 74. Sexton used funds from CDC's operating account to pay for the actions required under the preliminary injunction. PSOF ¶ 75. When those funds were depleted, Sexton accessed cash in CDC's closure/post closure fund to pay for the required clean-up actions. PSOF ¶ 76.

In response to the state court injunction, in the spring of 2006, CDC undertook significant modifications to the landfill gas management system. [226] Ex. I at ¶¶ 4-5.[3] The gas management system was a system that worked to limit gas emissions through incineration and other containment measures. The work involved in the spring 2006 modification was completed in April 2006, even though

---

[3] It is unclear when exactly the landfill gas management system was originally constructed. In September 9, 1995, the Illinois Environmental Protection Agency issued a permit allowing the construction of a landfill gas management system at the CDC Landfill, but there is no information in the record showing exactly when that construction began. [242] Ex. 1.

a significant amount of additional work on the system was performed in 2007-2008. [242] Ex. 3 at ¶¶ 12-14.

In January 2007, a Second Supplemental Agreed Order was entered in the state court proceeding. [230] Ex. 9. The Second Supplemental Order required Allied to investigate the adequacy of the gas collection and control system ("GCCS") and propose necessary remedies to effectively manage the landfill gas. PSOF ¶ 14. Roughly a month later, on February 14, 2007, Sexton and Allied agreed to a Fourth Amendment to the Partnership Agreement.[4] [44] Ex. 1 at pp. 62-65. As part of that Amendment, Allied agreed to act as Operator of the CDC. SSOF ¶¶ 12, 15. The Illinois Environmental Protection Agency ("IEPA") approved that change on June 27, 2007, *id.* at ¶16, and Allied has continued to serve in that position up through the present day. PSOF ¶ 72. In the Fourth Amendment, the parties also agreed that: "Nothing contained herein is intended to, nor shall it modify, limit or extinguish (a) any other duties or obligations that the Partners owe to each other or to the Partnership under the Partnership Agreement," and the Partners "will not cause the Partnership to be dissolved or cause any change in their relationship as Partners to occur until the Landfill has been closed and any required remediation work has been completed in accordance with all applicable laws, rules, regulations and court orders." [44] Ex. 1 at pp. 62-65.

As noted, the Second Supplemental Order required that CDC investigate the adequacy of the GCCS and propose any necessary remedies. In May 2007, the GCCS consisted of: (1) vertical gas extraction wells that are located in the waste fill

---

[4] All prior Amendments are irrelevant for this Court's purposes.

area; (2) perimeter gas interception wells that are located outside the waste fill area; (3) a piping system that extracts and transports the landfill gas to the existing flares; (4) a landfill gas condensate system of piping, sumps, and pumps; (5) a northwest quadrant interim odor control system; and (6) blower-flare stations. PSOF ¶ 15. The work on the GCCS undertaken pursuant to the Second Supplemental Agreed order began in the Spring of 2007. *Id*. at ¶ 32.

In March 2007, CDC submitted to the State an "Area 1 Work Plan" evaluating several aspects of the gas collection portion of the GCCS. *Id*. at ¶ 21. In September 2007, the blower-flare stations were the gas control portion of the GCCS and consisted of two skid-mounted utility flares (candlestick flares) and one enclosed flare. PSOF ¶ 16. As part of its Area 5 evaluation under the Second Supplemental Order, the CDC had assessed the volume of gas flow and the constituents in the gas at the two candlestick flares. PSOF ¶ 17. In September 2007, CDC proposed a remedy to the gas control portion of the GCCS that consisted of replacing the two candlestick flares with an enclosed flare. PSOF ¶ 18. The State approved that change in April 2008. *Id*. at ¶ 19. Importantly, much of the CDC's 2006 landfill gas management system, excluding the vertical gas wells, is no longer in operation because it was not successful in controlling the release of landfill gas. PSAF ¶ 13. However, the 2007-2008 modifications to that system are still in use at the site. DSOF ¶ 42.

CDC undertook a number of other actions in response to the Second Supplemental Order. In November 2007, CDC submitted a Revised GCCS Design

Plan that proposed remedies to the GCCS system to contain landfill gas on-site. *Id*. at ¶ 22. The "Area 7 Work Plan" (September 5, 2007) set out a process for determining the total amount of leachate generated at the landfill and evaluating the leachate conveyance system. *Id*. at ¶ 24. The October 29, 2007 "Area 6 Work Plan" evaluated historic leachate discharges at the Site, and recommended solutions to contain the leachate and prevent it from commingling with storm-water. *Id*. at ¶ 23.

Throughout its compliance with the state court order, Allied – on behalf of CDC – submitted weekly, monthly, and quarterly progress reports to the State summarizing completed activities, analyzing and discussing data trends, and describing future activities. PSOF at ¶ 36. The State participated in bi-monthly meetings with members of the CDC partnership, including Allied, to discuss the progress of corrective actions and provide approval for future corrective actions. *Id*. at ¶ 37. The State also approved recommended response and corrective actions in meetings and by approving significant permit modifications and construction quality assurance reports. *Id*. at ¶ 38.

Some of the response actions Allied implemented at the landfill corresponded to the EPA's Presumptive Remedy for CERCLA Municipal Landfill sites. *Id*. at ¶ 39. The Presumptive Remedy includes "preferred technologies for common categories of sites, based on historical patterns of remedy selection and EPA's scientific and engineering evaluation of performance data on technology implementation. The objective of the presumptive remedies initiative is to use the

program's past experience to streamline site investigation and speed up selection of cleanup actions. Over time, presumptive remedies are expected to ensure consistency in remedy selection and reduce the cost and time required to clean up similar types of sites. Presumptive remedies are expected to be used at all appropriate sites except under "unusual site-specific circumstances." [252] Ex. 2.

Throughout the state court litigation and the resulting orders, Sexton experienced a variety of financial hardships. On December 5, 2007, Arthur Daniels sent an email to Jim Van Weelden of Allied seeking information for Sexton's year-end financial statements. SSOF ¶ 15. Arthur included the following three questions in that email: (1) "Allied has been recording 100% of its activity of Congress on Allied's books. Will that continue?"; (2) "Is Allied expecting any other financial contribution of any type from Sexton now or in the future, or is Allied planning on being responsible for all financial obligations for Congress?"; and (3) "Is Allied planning to make capital calls or otherwise look to Sexton as a source of additional funds?" *Id.* In its December 12, 2007 response to that email, Allied said that it had "not yet determined whether or what type of financial contribution is presently needed from Congress Development's individual partners. Allied would expect that any Congress Development Company financial obligation and/or contribution would be handled in accordance with the terms of the Partnership Agreement." *Id.* at ¶ 16.

On March 12, 2008, the state court entered an "Agreed Order for Emergency Engineered Closure." PSOF at ¶ 25. That order required the landfill to accelerate

the filling in of the site such that no solid waste was received after June 15, 2008. *Id*. It also required the installation of the landfill cap by December 31, 2008. *Id*. The landfill cap consists of an engineered multi-layer system to prevent precipitation from entering the landfill and a slip liner to control releases of leachate and gas around the landfill perimeter. *Id*. at ¶ 26. The landfill cap works in tandem with the GCCS to promote efficient collection of landfill gas. *Id*. at ¶ 27.

On August 17, 2010, the state court entered a Final Consent Order between the IEPA, CDC, Sexton and Allied. [230] Ex. 18. The August 17, 2010 Final Consent Order required Allied to perform a Corrective Action Measures Assessment ("CAMA") as detailed in 35 Ill. Admin. Code 811.324. PSOF ¶ 28. The CAMA involves an analysis of the various potential corrective action measures that could be used in meeting all of the requirements and objectives of the clean-up. 35 Ill. Admin. Code 811.324. Allied, on behalf of CDC, continues to this day to assess the nature and extent of groundwater contamination at the landfill. *Id*. at ¶ 31. It also continues to conduct the CAMA. PSAF ¶ 11. Notably, the Final Consent Order includes a Release from Liability provision that is contingent on the completion of all activities required therein. PSAF ¶ 10.

On September 30, 2010, Allied and Sexton executed the Fifth Amendment to the Partnership Agreement. That Amendment memorializes the Partners' agreement that Allied had made over $78 million in additional capital contributions to the Partnership and Sexton had failed to contribute its one-half share. [44] Ex. 1 at pp. 68, 70, ¶ 14 and Schedule 1. Further the Fifth Amendment makes clear that,

notwithstanding these contributions, both partners were expected to make their one-half share of capital contributions. *Id*. at pp. 66-67, ¶ 3. Similarly, the Fifth Amendment contemplated that Sexton, the non-contributing partner, would later contribute its share of additional capital. *Id*., at p. 67, ¶ 4, ("If a Non-Contributing Partner later contributes its share of additional capital to the Partnership, the Partnership shall specially allocate additional losses").

The Fifth Amendment to the agreement indicates that nothing in the amended agreement is intended to modify the parties' obligation to make equal capital contributions or otherwise change the relationship of the parties. [44] Ex. 1 at p. 63, ¶ 6 ("[n]othing contained herein is intended to, nor shall it modify, limit or extinguish (a) any other duties or obligations that the Partners owe to each other or to the Partnership under the Partnership Agreement"). Additionally, it states that "the Partners . . . will not cause any change in their relationship as Partners to occur until the Landfill has been closed and any required remediation work has been completed in accordance with all applicable laws, rules, regulations and court orders." *Id*. at p. 64, ¶ 10. Finally, the Fifth Amendment shows that Allied made millions of dollars in capital contributions with respect to which Sexton failed to contribute its one half share. *Id*. at p. 68, ¶ 14; Schedule 1. It also shows that the "Partner's respective interests in the Partnership were adjusted" pursuant to Section 2.01(e) of the Partnership Agreement. *Id*. The percentages were adjusted from 50/50 in 2007, to approximately .04% for Sexton and 99.96% for Allied at the end of 2014. SSOF ¶ 17.

The parties dispute whether Allied made a written request to Sexton for an additional capital contribution before filing this lawsuit. SSOF ¶ 14. Allied claims that the Fifth Amendment to the Partnership Agreement is one example of a written request for additional capital contributions. [44] Ex. 1 at pp. 66-70. It further claims that Allied asked Sexton to make capital contributions in October 2009, March 2010, and March 2013. [242] Ex. 6 at No. 2.

From July 2007 through September 2014, Allied incurred more than $96 million in costs implementing work at the landfill. PSOF at ¶ 33. Since February 2007, Allied has paid all of the additional capital necessary to pay the operating, investigation, remediation and other expenses for the CDC Site. *Id*. at ¶ 34.

## II.  Legal Standard

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In deciding a motion for summary judgment, this Court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *See CTL ex rel. Trebatoski v. Ashland School District*, 743 F.3d 524, 528 (7th Cir. 2014).

### III. Analysis

#### a. Sexton's Motion for Summary Judgment

Defendant Sexton moves for summary judgment on: (1) Allied's Count IV breach of contract claim; and (2) Allied's Count III CERCLA cost recovery claim. The Court will address each count in turn.

#### i. Count IV – Breach of Contract

In its breach of contract claim, Allied alleges that Sexton breached Section 2.01 of the Partnership Agreement by failing to contribute its one-half share of the required capital contributions. Sexton contends that it is entitled to summary judgment on that claim because: (1) Allied cannot bring a breach of contract claim because the sole remedy available under the Partnership Agreement is the adjustment of Sexton's interest in the partnership; (2) Allied waived its breach of contract claim; and (3) if Allied is allowed to proceed, damages on its breach of contract claim must be limited to Sexton's share of the profits and losses.

#### 1. Sole Remedy

Sexton claims that Allied's breach of contract action cannot proceed because the dilution of partnership interest under Section 2.01(e) of the Partnership Agreement is the "sole remedy" for its failure to make capital contributions. Sexton's "sole remedy" argument fails, however, because the issue has already been decided in this case, and re-litigation is barred by the law of the case doctrine. The "law of the case doctrine embodies the notion that a court ought not to re-visit an earlier ruling in a case absent a compelling reason, such as manifest error or a

change in the law, that warrants re-examination." *Minch v. City of Chicago*, 486 F.3d 294, 301 (7th Cir. 2007). The doctrine has greater force when there is a change of judge during the litigation, and the new judge is asked to revisit the rulings of his predecessor. *HK Systems, Inc. v. Eaton Corp.*, 553 F.3d 1086, 1089 (7th Cir. 2009). The Seventh Circuit has held that the law of the case doctrine, although "not hard and fast," should not be ignored unless there are "unusual circumstances that justify abandonment of the law of the case" including: (1) substantial new evidence introduced after the first review; (2) a decision of the Supreme Court after the first review that is inconsistent with the decision on that review; or (3) a conviction on the part of the second reviewing court that the decision of the first was clearly erroneous. *Kathrein v. City of Evanston, Ill.*, 752 F.3d 680, 685 (7th Cir. 2014).

Here, the "sole remedy" argument was previously decided by Judge Chang in his ruling on the Defendants' motions for judgment on the pleadings. [122]. In his ruling, Judge Chang concluded that based upon "the contract's unambiguous plain language, the partnership adjustment clause is not an exclusive remedy for failure to contribute to the partnership." *Id.* at 11. As a result, the Court denied Sexton's motion for judgment on the pleadings. *Id.* at 14. That finding is law of the case, and the Defendants have not presented any changed facts or law that would justify this Court overturning the previous ruling. Nor have they shown that Judge Chang's ruling was clearly erroneous. Thus, Sexton's argument regarding the supposed "sole remedy" is unavailing.

## 2. Waiver

Sexton additionally argues that Allied waived its breach of contract claim for money damages by steadily diluting Sexton's share in the partnership instead of demanding payment. "A waiver is the intentional relinquishment of a known right. There must be both knowledge of the existence of the right and an intention to relinquish it." *Pantle v. Industrial Comm'n*, 335 N.E.2d 491, 496 (Ill. 1975). For waiver to apply, Illinois law requires a "clear, unequivocal, and decisive act of its opponent manifesting an intention to waive its rights." *PPM Finance, Inc. v. Norandal USA, Inc.*, 297 F. Supp. 2d 1072, 1087 (N.D. Ill. 2004). The burden of proving such an act is on the party claiming waiver. *In re Nitz*, 317 Ill. App. 3d 119, 130 (Ill. App. Ct. 2000).

Here, Sexton argues that Allied waived its breach of contract claim for money damages by consistently adjusting Sexton's partnership share downwards. According to Sexton, Allied took action indicative of its decision to pursue partnership dilution when: (1) it issued K-1 tax forms showing the dilution of Sexton's partnership interest; and (2) it entered in to the Fifth Amendment to the Partnership Agreement, which adjusted the parties' interest in the Partnership. [221] at 11. Sexton claims these actions demonstrate that Allied decided to adjust the partnership shares rather than make a monetary claim. This argument fails for two reasons: (1) the dilution of the partnership share does not necessarily imply a decision to forego monetary claims; and (2) the evidence in the record does not show

a "clear, unequivocal, and decisive act" of waiver, but rather a decision to continue to enforce the Partnership Agreement.

Sexton's waiver argument is predicated on the idea that the dilution of partnership share is the sole remedy for failing to make a capital contribution. Sexton's logic is that Plaintiff's decision to pursue partnership dilution shows a choice to forego a claim for monetary damages. This is true only if choosing dilution automatically forecloses all other remedies. This argument fails, however, because the dilution of partnership share is not the sole remedy. [122] at 11. Thus, the pursuit of that dilution does not in any way imply the relinquishment of a claim to monetary damages. It instead shows a decision to pursue one potential remedy amongst many – which does not foreclose the later pursuit of additional available remedies. Because the Partnership Agreement does not require Allied to choose between an adjustment of partnership interest or a claim for damages, Allied can pursue both remedies. Thus, its decision to pursue the adjustment in partnership interest cannot be interpreted as an unequivocal and decisive act manifesting a choice to waive the right to monetary damages.

Additionally, the actions by Allied and the amendments to the Partnership Agreement show affirmatively that Allied did not intend to waive its right to additional remedies. First, there is evidence in the record that Allied requested Sexton's required capital contributions in October 2009, March 2010, and March 2013. [242] Ex. 6 at No. 2. Second, the Fourth and Fifth Amendments to the Partnership Agreement indicate a reservation of all rights previously available

under the Partnership Agreement despite the dilution of interest. In the Fourth Amendment (2/14/2007), the parties agreed that: "Nothing contained herein is intended to, nor shall it modify, limit or extinguish (a) any other duties or obligations that the Partners owe to each other or to the Partnership under the Partnership Agreement," and the Partners "will not cause the Partnership to be dissolved or cause any change in their relationship as Partners to occur until the Landfill has been closed and any required remediation work has been completed in accordance with all applicable laws, rules, regulations and court orders." [44] Ex. 1 at pp. 62-65. Prior to the Fourth Amendment, the Partnership Agreement allowed for remedies besides the dilution of partnership shares – including monetary remedies. [122]. Thus, the Fourth Amendment language cited above shows an intent by the parties to allow the continued vitality of those remedies despite the ongoing dilution of partnership shares.

The Fifth Amendment to the Partnership Agreement manifests a similar intent. In that agreement, dated September 30, 2010, the parties expressly agreed that the "adjustment of the Partners' interests shall not, in any way, reduce or eliminate the obligations of each Partner to contribute its one-half share of all additional capital required by the Partnership." [44] Ex. 1 at pp. 66-67. This clearly requires that the parties continue making the capital requirements under the Partnership Agreement, even though their partnership interests had changed. Because the Fifth Amendment did not include any language limiting the remedies available under the Partnership Agreement, it suggests that all of the previously

available remedies (including money damages) remained available despite the dilution of partnership percentages.

Finally, a December 2007 email exchange between Sexton and Allied shows that Allied intended that the Partnership Agreement (and its available remedies) remain in effect. In the exchange, Arthur Daniels from Sexton asks, "Is Allied expecting any other financial contribution of any type from Sexton now or in the future, or is Allied planning on being responsible for all financial obligation for Congress?" [242] at ¶ 8. Allied responded "Allied has not yet determined whether or what type of financial contribution is presently needed from Congress Development Company's individual partners. Allied would expect that any Congress Development Company financial obligation and/or contribution would be handled in accord with the terms of the Partnership Agreement." *Id*. at ¶ 8. Because the Partnership Agreement requires each Partner to "contribute additional capital equally," [230] ¶ 69, Allied's communication to Sexton (that it expected contributions to be handled in accord with the Partnership Agreement) clearly informed Sexton that it expected Sexton to make additional capital contributions. Certainly, this record does not contain any "clear, unequivocal, and decisive act" manifesting a choice to waive rights under the Partnership Agreement.

### 3. Recovery Limited by Partnership Share

Sexton's third argument is that Allied's recovery on the breach of contract claim should be limited according to Sexton's ownership of the Partnership. In other words, because Sexton came to own only .04% of the partnership, it should

only have to pay .04% of Allied's claimed contractual damages. Sexton's argument is based upon a misreading of Section 2.02 of the Partnership Agreement. That Section states that the "profits and losses **of the Partnership** shall be allocated each year based on the Partners' respective interests in the Partnership at the end of the year." [222] Ex. E (emphasis added). The term "profits and losses" of the Partnership "means the Partnership's taxable income or loss, as reflected on the Partnership's federal income tax return." *Id.*

Here, Allied is not suing to recoup a loss suffered by the partnership, nor is it even suing on behalf of the partnership. Allied is suing on its own behalf to recover losses it suffered (not the partnership) when it had to make excess contributions over and above those required of it by Partnership Agreement. It is not suing to vindicate any partnership rights, or to collect for any partnership losses. As such, Section 2.02 does not apply to the present dispute in the manner suggested by Sexton.

## ii.  Count III – CERCLA Cost Recovery

With regard to Allied's CERCLA Section 107 cost recovery claim, Sexton requests summary judgment because: (1) Allied was required to bring its claim under Section 113 and is barred from bringing a claim under Section 107; and (2) if Allied is allowed to bring a claim under Section 107, that claim is time-barred under the applicable statute of limitations.

### 1. CERCLA Sections 107 and 113

Sexton argues that it is entitled to summary judgment on Allied's CERCLA claim because Allied is barred from bringing a cost recovery action under Section 107. CERCLA was passed in 1980 "to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." *Burlington Northern & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009). CERCLA provides two distinct private causes of action, each with its own statutory trigger, remedy, and limitations period. 42 U.S.C. § 9613(f); *Bernstein v. Bankert*, 733 F.3d 190, 200-02 (7th Cir. 2012). Section 107 authorizes "cost recovery" actions for parties to "recover costs incurred during a self-initiated environmental cleanup." *NCR Corp. v. George A. Whiting Paper Co.*, 768 F.3d 682, 690 (7th Cir. 2014), *reh'g denied* (Nov. 5, 2014); 42 U.S.C. § 9607. Section 113 authorizes "contribution" claims between multiple potentially responsible parties where one party has resolved its liability for at least some of the clean-up costs. 42 U.S.C. § 9613(f).

Under Seventh Circuit precedent, a party that has a Section 113 claim must bring suit under that Section, and may not bring a Section 107 claim. *Akzo Coatings, Inc. v. Aigner Corp.*, 30 F.3d 761, 764 (7th Cir. 1994) (a claim "by and between jointly and severally liable parties for an appropriate division of the payment one of them has been compelled to make" must be brought under Section 113); *NCR Corp. v George A. Whiting Paper Co.*, 768 F.3d 682, 691 (7th Cir. 2014)

("this court – like our sister circuits – restricts plaintiffs to section 113 contribution actions when they are available").

Sexton argues that Allied had a viable cause of action under Section 113, and therefore is barred from advancing the current Section 107 claim. There are two possible causes of action under Section 113 – Section 113(f)(3)(B) and Section 113(f)(1). *Cooper Indus., Inc. v. Availl Services, Inc.*, 543 U.S. 157, 167 (2004) (quoting 42 U.S.C. § 9613(f)(1)). Because the parties devote the majority of their attention to Section 113(f)(3)(B), the Court will address that Section first, followed by Section 113(f)(1). Section 113(f)(3)(B) reads as follows: "A person who has **resolved its liability** to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to a settlement referred to in paragraph (2)." 42 U.S.C. § 9613(f)(3)(B) (emphasis added). At issue here is whether Allied "resolved its liability" to the State of Illinois by way of the state court proceedings.

The Seventh Circuit's opinion in *Bernstein v. Bankert*, 733 F.3d 190 (7th Cir. 2013) is instructive. In *Bernstein*, the plaintiffs entered into an Administrative Order of Consent in 2002 (the 2002 AOC) with the EPA to implement a CERCLA response action. *Id*. at 207. The 2002 AOC included a conditional covenant not to sue and a release from CERCLA liability that was expressly conditioned on the plaintiffs' fulfillment of their obligations under the order. *Id*. The plaintiffs incurred significant costs undertaking response actions under the 2002 AOC and,

prior to completion of that work, sued defendants under CERCLA 107(a). The defendants argued that because of the 2002 AOC, the plaintiffs could only bring a claim under 113(f). The Court disagreed, explaining that "since the work to be performed in the AOC was ongoing when this action was filed, and no notice of approval had issued which would trigger the conditional covenants not to sue, the contribution action under section 113 is likewise unavailable." *Id*. at 207. In other words, because the conditional covenants not to sue had not been triggered, the plaintiffs had not resolved their liability under the AOC. *Id*. Thus, the plaintiffs had no claim under Section 113 and were allowed to proceed on their Section 107 claim.

Here, Sexton cites the state court's August 17, 2010 Final Consent Order ("FCO") as evidence that Allied "resolved its liability" to the State of Illinois. That argument fails, though, because the FCO itself shows that – like *Bernstein* – the resolution of Allied's liability is contingent on the completion of the work required by the Order. The FCO reads:

> "In consideration of the Congress Defendants' payment of a $1,000,000.00 penalty, $100,000 in past Illinois EPA costs, $100,000 in past Illinois Attorney General costs, future Illinois EPA costs associated with the Community Relations Plan as provided in Section IV.C.2, payment of the State Project Consultant costs provided for in Section V.N, and **completion of all activities required hereunder**, the Plaintiff releases, waives and discharges the Congress Defendants from any further liability or penalties for the violations of the Act and Board Regulations that were the subject matter of the Complaint filed in this matter and additional allegations of noncompliance set forth in Section I.D herein . . . The Plaintiff reserves, and this Consent Order is without prejudice to, all rights of the State of Illinois against the Congress Defendants with respect to all other matters, including but

> not limited to the following: . . . d. the Congress Defendants' failure to satisfy the requirements of this Consent Order."

FCO at § XII (emphasis added). The FCO also requires the completion of a CAMA in accordance with 35 IAC 811.324. [230] at ¶ 28. To this day, Allied continues to conduct the CAMA and the other work required under the FCO. [230] ¶ 31; PSAF ¶ 11. Viewing the facts and drawing all reasonable inferences in favor of Allied, the Court finds that the release of liability under the FCO is conditioned upon the completion of certain required work and future payments. Because the work required under the FCO is ongoing, and there is no evidence in the record concerning whether the future payments have been made, the Court cannot find that the conditional release of liability in the FCO has been triggered. This precludes any action under Section 113(f)(3)(B), thus allowing Allied to proceed under Section 107. *See Bernstein*, 733 F.3d at 207.

Sexton does not contest the Court's interpretation of the FCO as containing a conditional trigger for the release of liability, but instead focuses on the portion of Section 113(f)(3)(B) requiring that the plaintiff resolve its liability for "**some** or all of a response action." 42 U.S.C. § 9613(f)(3)(B) (emphasis added). According to Sexton, because Allied completed "some" of the work required under the various state court orders, it has resolved "some" of its liability. Specifically, the Defendants cite to the hundreds of reports and seven years of engineering activities summarized in the Final Consent Order. They also rely on the various sections of the FCO detailing work completed prior to the entry of the FCO. *See* [256] at 12-13. But the fact that "some" work has been completed, even if it is a substantial amount

of work, does not mean that "some" liability has been resolved. The Final Consent Order is clear that the release of liability is triggered by – among other things – the "completion of **all** activities required hereunder." (emphasis added). While Allied has completed a great deal of work under the FCO, it has not completed "all activities" required thereunder. Thus, Allied has not yet resolved any of its liability for the response actions.

As to the second cause of action available under Section 113, any claim by Sexton that Allied could have brought its case under Section 113(f)(1) similarly fails. The Supreme Court has held that a CERCLA Section 113(f)(1) action may only be sought during or following a civil action under Section 106 or 107(a). *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 168 (2004). Prior to initiation of this suit, Allied had not been subject to a civil action under CERCLA Section 106 or 107(a). PSAF ¶ 12. As a result, a CERCLA § 113(f)(1) action is unavailable to Allied, and it may pursue its claim under Section 107. *Bernstein*, 733 F.3d at 202.

## 2. CERCLA Statute of Limitations

Sexton also argues that, if Allied is allowed to proceed under Section 107, its claim is barred by CERCLA's statute of limitations. The Section 107 statute of limitations requires that lawsuits to recover costs of "remedial actions" must be commenced within six years of the initiation of the physical on-site construction of the remedial action. *See U.S. v. Navistar Intern. Transp. Corp.*, 152 F.3d 702, 712 (7th Cir. 1998). On the other hand, cost recovery lawsuits based upon "removal actions" must be initiated within three years after the completion of the removal

action. 42 U.S.C. § 9613(g)(2)(A). Sexton claims that the initiation of the land gas management system in January 2006 occurred outside of the six year statute of limitations for remedial actions, and therefore Plaintiff's Section 107 claim is time barred. To address that argument, the Court must first determine whether the initiation of the land gas management system was a "remedial action" or a "removal action."

A "removal action" is defined by CERCLA to mean "the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release." 42 U.S.C. § 9601(23). A "remedial action" is an action "consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment." 42 U.S.C. § 9601(24).

Practically speaking, "removal actions are those taken to counter imminent and substantial threats to public health and welfare, while remedial actions are

longer term, more permanent responses." *Bernstein*, 733 F.3d at 201 n.6 (internal citations and quotations omitted). In other words, "removal refers to a short-term action taken to halt risks posed by hazardous wastes immediately" and "remedial actions involve permanent solutions, taken instead of or in addition to removal, such as the destruction of hazardous materials." *Frey v. E.P.A.*, 403 F.3d 828, 835 (7th Cir. 2005). Here, Allied argues that the initiation of the land gas management system was a removal action, while Sexton claims it was remedial. The parties dispute: (1) whether the land gas management system was constructed in response to an imminent threat to public health and welfare; and (2) whether the system was a short-term stop gap measure, or a long term solution. As to each issue the factual record contains conflicting evidence.

Regarding the allegedly imminent threat to public health and welfare, there is evidence that in January 2006 the State of Illinois considered the ongoing release of landfill gas from the CDC site to be a "threat to human health and the environment" that required an immediate injunction to stop it. PSOF Ex. 20. At that time, the release of landfill gas had been ongoing (at an unknown rate) since at least November 20, 2005, and there was evidence that the gas had caused human illness. *Id.* at IEPA Aff. Later that same year, however, Allied denied that the gas release posed a threat to public health safety or welfare. [240] Ex. 13 at 6.

There are also conflicting facts regarding the permanence of the land gas management system. According to Jay Corgiat, an environmental consultant who worked at CDC until 2008, the construction of the gas management system began in

early 2006, DSOF ¶ 41, and other evidence submitted by the Daniels show that it is still operating at the landfill to this day. DSOF ¶ 42. On the other hand, Allied has provided evidence showing that the original system installed in 2006 was actually short term, that it was removed in 2007, and that it was replaced with an entirely new system at that time. [242] Ex. 3 at ¶¶ 13-14. As such, the 2006 version of the system was only in place for less than a year. *Id.* The facts regarding these two issues (emergency and permanence) are disputed such that a reasonable jury could find that the installation of the gas management system was not a "remedial action." Thus, to the extent Sexton's motion for summary judgment relies upon the "remedial action" statute of limitations, it is denied.

Sexton offers an additional statute of limitation argument, however, claiming that – even if this is considered a "removal action" – Allied's claim is nonetheless time barred. Lawsuits based on "removal actions" must be initiated within three years after the completion of the removal action. 42 U.S.C. § 9613(g)(2)(A). A removal action is not complete until a document has been issued which contains the final remedy selected for the site, or until the government ceases to evaluate, assess and monitor the land. *United States v. Saporito*, No. 07 C 3169, 2011 WL 2473332, at *2 (N.D. Ill. June 22, 2011) (citing *Illinois v. Grigoleit Co.*, 104 F. Supp. 2d 967, 975 (C.D. Ill. 2000).

Defendants claim that the removal action was completed in December 2008, and is therefore barred by the three year removal statute of limitations. According to the Daniels, Allied admitted in its Response to Sexton's Motion for Summary

Judgment [241] that its "removal action was completed" in "December 2008, when the closure certification was submitted." [256] at 15. However, that argument omits an important part of Allied's statement, which reads in full: "the removal action was completed (if completed at all) in December 2008 when the closure certification was submitted." [241] at 13. In fact, the evidence before the Court show that a final corrective remedy has not yet been selected. PSAF ¶ 18. Although work under the Second Supplemental Order and Emergency Closure Order was largely complete when the landfill submitted its closure certification on December 31, 2008, the nature and extent of the groundwater impacts had not been identified. PSAF ¶ 11, 16, 17. In fact, the nature and extent of groundwater impacts still have not been determined. PSAF ¶ 31. Therefore, a final corrective action remedy for the site cannot be selected. PSAF ¶ 18. In light of the foregoing, it is clear that this action – even if considered a removal action – is timely under that statute of limitations.

### b. The Daniels' Motion for Summary Judgment

Todd and Arthur Daniels move for summary judgment on: (1) Allied's Count III CERCLA claim; and (2) the Daniels' breach of contract counterclaim. In addition, the Daniels advance a general argument that Allied cannot maintain this lawsuit against its own agents. The Court will first consider the general agency argument.

### i. The Daniels' Agency Argument

The Daniels claim that Allied is improperly trying to sue its agents (the Daniels) for actions they took in the scope of their work for the partnership. According to the Daniels, this lawsuit is contrary to the principles of agency law and Section 9.03 of the Partnership Agreement. As such, the Daniels generally contend that "Allied cannot maintain this lawsuit." [224] at 14. Because the only claim alleged by Allied against the Daniels is the Count III CERCLA claim, the Court will address this argument as a motion for summary judgment on Count III.

As an initial matter, a portion of the Daniels' general agency argument is barred by law of the case. *Kathrein v. City of Evanston, Ill.*, 752 F.3d 680, 685 (7th Cir. 2014). To the extent the Daniels argue that Allied is prohibited from seeking to recover against them because they are agents of the partnership, that issue was previously decided by Judge Chang. [122]. As mentioned above, the Defendants filed motions for judgment on the pleadings on October 16, 2013. [34], [37]. In their motion, the Daniels argued that because they were acting as agents of the partnership within the scope of its business, Section 9.03 of the Partnership Agreement and general agency law required Allied to indemnify them for "any and all judgments, claims or penalties." [36] at 6. In denying that motion, Judge Chang found that: (1) the "only reasonable construction of the plain language of Section 9.03 is that the partners agreed to indemnify each other and their agents, employees and officers against claims brought by nonparties to the agreement"; and (2) "the agency principles cited by Daniels . . . do not apply to claims asserted by one

of the partners." [122] at 18. The Daniels have not provided any new evidence or argument undermining those findings, nor have they shown that Judge Chang's ruling was clearly erroneous. As such, their agency arguments fail here as well.

The Daniels contend, however, that there are four other agency-related arguments currently pending that were not resolved by Judge Chang's Opinion: (1) that Allied must indemnify the Daniels for costs incurred in the scope of the agency even if there is no third party claim; (2) that a principal may not sue itself by suing its agents; (3) that allowing Allied to seek recovery from its agents is contrary to public policy; and (4) that Allied cannot do indirectly what it cannot do directly.

Regarding argument one, that contention is barred by law of the case, as Judge Chang specifically found that any indemnification requirement applies only to claims by nonparties to the Partnership Agreement. [122].

As to the Daniels' second argument, the Daniels rely on a non-precedential Seventh Circuit opinion stating that a "suit against an agent, as agent, is a suit against the principal." *Hecking v. Air Lines Pilots Ass'n Intern.*, 200 F. App'x. 614, 615 (7th Cir. 2006). The Daniels argue that, as agents of Allied, the CERCLA action against them is improper because Allied cannot sue itself. This argument confuses the relevant principal/agency relationships at issue here. According to the Daniels, they are agents of Sexton and of the Partnership. DSOF ¶19. There is no evidence, however, that the Daniels constitute agents of Allied. In fact, under Illinois partnership law, a "partnership is an entity distinct from its partners." 805 ILCS 206/201. So simply being an agent of the partnership does not make the

Daniels agents of Allied. As such, Allied is not suing itself (*i.e.*, its own agents), but is rather suing two agents of the partnership. Accordingly, the Daniels' second argument is without merit.

For their third argument, the Daniels claim that allowing Allied to seek recovery from its agents is contrary to public policy. This argument fails for two reasons. First, there is no evidence that the Daniels were agents of Allied. Second, the Daniels base their argument upon the idea that agency law protects agents from personal liability for claims founded on their activities within the scope of employment. While this concept may generally apply to claims against agents brought by third parties, Judge Chang already found that neither the Partnership Agreement nor general agency law provide for the indemnification of the Daniels in response to Allied's claim. Under the law of the case doctrine, this Court sees no reason to overturn that decision.

Fourth, the Daniels argue that an entity cannot "do indirectly that which it cannot do directly." [224] at 10. The crux of this argument appears to be that if "Allied were required to indemnify" the Daniels, if a third-party had sued the Daniels, then "Allied must also be required to indemnify the Daniels when it seeks to pass liability for third-party claims to its agents." *Id*. at 11. That argument is meritless, because Allied is not seeking to pass along liability for third party claims to the Daniels. The Daniels are not Allied's agents, and – once again – Judge Chang already found that Allied was not required to indemnify the Daniels for its claim against them.

### ii.  The Daniels' Breach of Contract Counterclaim

The Daniels also move for summary judgment on their counterclaim for breach of contract.  The Daniels argue that Allied's suit against them – and its failure to indemnify them – breached Section 9.03 of the Partnership Agreement.  This argument fails under the law of the case doctrine, as Judge Chang already found that the "only reasonable construction of the plain language of Section 9.03 is that the partners agreed to indemnify each other and their agents, employees, and officers against claims brought by *non*parties to the agreement."  [122] at 16 (emphasis in original).  Because the indemnification provision in Section 9.03 only applies to claims by non-parties to the Partnership Agreement, it has no bearing on Allied's lawsuit against the Daniels.  As Section 9.03 did not require Allied to indemnify the Daniels, it cannot be held liable for the failure to provide that indemnity.  The Daniels' motion for summary judgment on their counterclaim is denied.

### iii.  Count III – Allied's CERCLA Claim

The Daniels seek summary judgment on Allied's CERCLA claim based upon the following arguments: (1) that the claim should have been brought under Section 113, not Section 107; (2) that the claim is barred by the relevant statute of limitations; and (3) that the Daniels are not "operators" under CERCLA.  The first two arguments were addressed above in Sections III(a)(ii)(1)-(2) of this Opinion, and the Court reaches the same conclusion with regard to the Daniels' motion for

summary judgment. To the extent their motion relies on those arguments, it is denied.

In their third argument, the Daniels argue that they do not qualify as "operators" under CERCLA, and therefore cannot be liable in a cost recovery action under Section 107. Under CERCLA, five elements are required to establish liability: (1) the site in question is a "facility"; (2) there has been a release or a threatened release of hazardous substances; (3) the plaintiff has incurred costs in response to the release or threatened release; (4) costs incurred in responding to the release were "necessary" and "consistent with the national contingency plan"; and (5) the defendant is a "responsible party." *Forest Park Nat. Bank & Trust v. Ditchfield*, 881 F. Supp. 2d 949, 977 (N.D. Ill. 2012). A responsible party is "any person who at the time of disposal owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2). At issue here is whether the Daniels "operated" the facility.

In 1994, the Seventh Circuit explained that an operator is someone "directly and personally engaged in conduct that led to the specific environmental damage at issue in the case." *Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund*, 25 F.3d 417, 421 (7th Cir. 1994). It held that "a plaintiff does not state a claim for owner or operator liability if she merely alleges that certain individuals had general corporate authority or served generally in a supervisory capacity. Active participation in, or exercise of specific control of, the activities in question must be shown." *Id*. at 422. Then, in 1998, the Supreme Court clarified the definition of a

CERCLA operator in *United States v. Bestfoods*, 524 U.S. 51 (1998).  The Court explained that "the statute obviously meant something more than mere mechanical activation of pumps and valves, and must be read to contemplate 'operation' as including the exercise of direction over the facility's activities." *Id.* at 71.  As such, it held that an operator "must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Id.* at 66.

The Daniels attempt now to narrow the operator definition set out in *Bestfoods* by citing *Browning-Ferris Indus. of Illinois, Inc. v. Ter Maat*, 195 F.3d 953, 956 (7th Cir. 1999).  Their argument fails, however, as they overstate the holding in *Ter Maat*.  In *Ter Maat*, the Seventh Circuit explained that *one way* to be an operator was to supervise the "day-to-day operations of the landfill – for example, negotiating waste-dumping contracts with the owners of the wastes or directing where the wastes were to be dumped or designing or directing measures for preventing toxic substances in the wastes from leeching into the ground and thence into the groundwater." *Id.*  The *Ter Maat* decision, however, did not say that example was the sole way to show operator liability, but just one way in which an individual could qualify as an operator.  The *Ter Maat* court did nothing to alter the definition of operator set out in *Bestfoods*, which remains the definition routinely applied in federal courts throughout the country.  *See e.g., City of Waukegan, Illinois v. Nat'l Gypsum Co.*, 560 F. Supp. 2d 636, 641 (N.D. Ill. 2008); N*ew York*

*State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 222 (2d Cir. 2014); *Litgo New Jersey Inc. v. Comm'r New Jersey Dep't of Envtl. Prot.*, 725 F.3d 369, 381 (3d Cir. 2013); *United States v. Twp. of Brighton*, 153 F.3d 307, 314 (6th Cir. 1998).

Here, the Daniels' motion for summary judgment is denied because there are several factual disputes concerning whether the Daniels managed, directed, or conducted "operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Bestfoods*, 524 U.S. at 66.

Todd Daniels submitted an affidavit stating that he did not make waste disposal decisions, particularly those relating to the disposal of hazardous waste, and did not manage the landfill waste disposal operations. [222] Ex. C ¶ 10. As such, he did not obtain a Certificate of Competency as a Class A Landfill Operator from the IEPA. DSOF ¶ 22. According to Todd, he did not negotiate waste disposal contracts with customers, did not assume active and personal responsibility for the overall management of the landfill, did not have responsibility over the operational functions of the landfill, and did not have the personal authority to control CDC's compliance with environmental laws. *Id.* at ¶ 23; [226] Ex. C at ¶¶ 12-14. Todd additionally testified that he did not have the authority to control where waste was disposed in the landfill. [226] Ex. C at ¶ 15.

Todd did, however, make decisions consistent with the site's operation as a sanitary landfill, [48] at ¶ 32, and meet with the landfill's operations manager and environmental consultants to review changes in site conditions in order to

determine a course of action related to those conditions. [230] Ex. 35, Ex. 36 at 15:23-16:13, 119:3-129:9. There is also evidence that Todd made decisions concerning the landfill's compliance with environmental regulations, [46] ¶ 32, and participated in meetings with regulators in which decisions on appropriate response actions were made, including efforts to "contain and control odor" at the landfill and address regulator concerns with discharges of leachate into the Village of Hillside sewer system. [230] Exs. 39-40. Further, Todd acted as Sexton's liaison with both the IEPA and the Village of Hillside. DSOF ¶ 26. He helped work out the terms of the settlement agreements and consent orders, and interacted with environmental consultants. *Id.*

Allied's Expert on Superfund liability, Richard Williams, offered his own take on the role played by Todd Daniels. When asked whether he thought that Todd Daniels exercised day-to-day decision making with regard to what waste was disposed of at the landfill, Williams responded "I didn't see anything that would suggest to me that he did." [226] Ex. E at 44:11-14. Williams added that he had no reason to believe that Todd exercised hands-on day-to-day decision making with regard to where solid waste was disposed, or that Todd had responsibility for the operational functions of the landfill. *Id.* at 108:4-21. On the other hand, Williams opined in his expert report that "Todd Daniels actively participated in, and made decisions regarding, the CDC Landfill's operation including environmental controls and the landfill's compliance with environmental regulations." [244] Ex. 4 at p. 1. He also explained that he believed Todd had personal authority to control CDC's

compliance with environmental laws. [226] Ex. E at 109:2-5. Finally, Williams stated – somewhat confusingly in light of his other testimony – "I looked at a lot of documents and based on what I read and based on these documents, it is difficult to come to any other conclusion, at least for me, that Mr. [Todd] Daniels was, in fact, responsible and was making decisions related to these – to the environmental response at the site." *Id*. at 134:13-134:18. In light of the foregoing, the Court finds that there are material factual disputes in the record that prevent it from finding – at summary judgment – that Todd Daniels was not an operator.

There are similar discrepancies in the evidence concerning the role of Arthur Daniels. Arthur testified via affidavit that he did not exercise hands-on, day-to-day participation in the management of the landfill, [226] Ex. B at ¶ 12, and did not have decision-making control over the landfill's compliance with environmental laws. *Id*. at ¶¶ 12, 18. In support these claims, Arthur offers evidence that he did not obtain the Certificate of Competency as a Class A Landfill Operator from the IEPA. [226] Ex. B at ¶ 16. There is also evidence in the record, however, that: (1) Arthur made decisions concerning the landfill's compliance with environmental regulations, [46] at ¶ 30; (2) he was identified as the point of contact for any questions from the IEPA regarding the landfill's Clean Air Act Permit compliance reports, [230] Ex. 27 at CDC0008910; (3) he signed hundreds of environmental compliance reports submitted to the IEPA attesting to each report's accuracy and completeness, [230] Ex. 27 at 24:6-26:13; (4) he participated in meetings with environmental consultants and government regulators to address environmental

issues, including landfill gas control problems, [230] Ex. 27 at 37:3-41:12, 102:22-112:20; Ex. 29 at JS00032204; Ex. 30 at JS-B0004853-JS-B0004856; and (5) he signed solid waste disposal permit applications submitted to the IEPA as the landfill's operator. [230] Ex. 32.

Via affidavit, Arthur further testified that he did not negotiate waste disposal contracts with customers. [226] at Ex. B ¶¶ 14, 18. But there is documentary evidence suggesting that, at the very least, Arthur had some involvement with the negotiation of waste disposal contracts. [244] Ex. 5; [230] Ex. 34. Later in his affidavit, Arthur claimed that he did not act as a manager of the landfill, did not have responsibility over the operational functions of the landfill, did not have the authority to control daily operations of the landfill, and did not direct waste inflow into the landfill. [226] Ex. B at ¶ 15. He added that he did not control the landfill's finances, *id*. at ¶ 19, did not control the price customers paid to dispose of waste at the landfill, *id*. at ¶ 20, and could not overrule employees' determinations of landfill development. *Id*. at ¶ 21. However, it is clear from the record that Daniels did have final authority regarding the operations of Sexton, who – as operator under the Agreement – had the responsibility for conformance with standard landfilling practices and entering contracts. Resp. to DSOF ¶ 32.

As with Todd Daniels, superfund expert Richard Williams offered his opinion on the role of Arthur Daniels. He testified that Allied had no facts to show that Arthur Daniels directed where waste should be disposed of at the CDC Landfill or exercised the control of a landfill manager at the CDC Landfill. [226] Ex. E at 72:1-

4, 73:11-15. As mentioned above, however, Williams also opined that "Arthur Daniels . . . actively participated in, and made decisions regarding, the Congress Landfill's operation including environmental controls and the landfill's compliance with environmental regulations." [244] Ex. 4 at p. 1. Given the foregoing disputed facts, the Court cannot find – at summary judgment – that Arthur Daniels was not an operator under CERCLA. The Daniels' motion for summary judgment on Allied's Count III CERLCA claim is denied.

### c. Allied's Motion for Summary Judgment

Allied moved for summary judgment on: (1) its Count III CERCLA claim; and (2) its Count IV breach of contract claim. As explained below, that motion is granted in part and denied in part.

### i. CERCLA – Count III

For a cost recovery action under Section 107, the Plaintiff must prove five elements to establish liability: (1) the site in question is a "facility;" (2) there has been a release or a threatened release of hazardous substances; (3) the plaintiff has incurred costs in response to the release or threatened release; (4) costs incurred in responding to the release were "necessary" and "consistent with the national contingency plan;" and (5) the defendant is a "responsible party." *Forest Park Nat. Bank & Trust v. Ditchfield*, 881 F. Supp. 2d 949, 977 (N.D. Ill. 2012) (citing *Emergency Servs. Billing Corp. v. Allstate Ins. Co.*, 668 F.3d 459, 463 (7th Cir. 2012)). Allied claims that it has proved those five elements, and is therefore entitled to summary judgment on Count III. Because the analysis differs with

regard to Sexton and the Daniels, the Court will address each Defendant individually.

## 1. The Daniels

Allied's motion for summary judgment on its CERCLA claim against the Daniels fails because there is a dispute of material fact concerning the Daniels' role at the landfill. As the Court has previously explained, based on the state of the evidence in the record, a reasonable jury could find that the Daniels did not qualify as operators under CERCLA. Allied's motion for summary judgment on its CERCLA claim against the Daniels is therefore denied.

## 2. Sexton

With regard to Sexton, Allied claims that it has proven all elements required for a cost recovery action under CERLCA Section 107. As explained below, the Court agrees.

### a. Facility

Allied argues that the CDC landfill qualifies as a "facility" under CERCLA. CERCLA "facilities" include "landfills" and "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9). Each defendant has admitted that: (1) the Site is a landfill; (2) acetone and xylene have been detected in the Site's groundwater and leachate; and (3) xylene is a CERCLA hazardous substance. PSOF ¶¶ 1-4. The evidence before the Court confirms this finding, and makes clear to the Court that

hazardous substances were stored, disposed of, placed or otherwise came to be located at the CDC site.

Defendants argue against this finding by claiming there is no evidence that hazardous materials were actually "disposed" at the site. Their argument misunderstands the law. CERCLA requires that a "hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located" at the site for it to be considered a facility. Here, the undisputed evidence shows that – at the very least – hazardous substances "came to be located" at the site. Gas and leachate released from the landfill contained hazardous substances, [238] ¶¶ 3, 4, 10, and the landfill odors released into the air were caused, in part, by methyl mercaptan – a CERCLA hazardous substance. [222] Ex. 14 at 26:17-27:8; 40 C.F.R. § 302.4. Also, Allied's experts testified that municipal solid waste – such as that located at the CDC landfill – contains hazardous substances. [237] Ex. P at 82:10-82:12; [237] Ex. L-3 at p. 22; [226] Ex. E at 74:20-74:23; [244] Ex. 4 at p. 4. And Todd Daniels admitted that municipal solid waste generally contains hazardous substances. [230] Ex. 36 at 140:13-16. Thus, the Court finds that the CDC landfill was a "facility" under CERCLA.

### b.  Release or Threatened Release

Allied claims it has provided evidence showing that there was a release or threatened release of hazardous substances at the landfill. CERCLA defines a "release" as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the

environment." 42 U.S.C. § 9601(22).  In addition to the Defendants' admissions that acetone and xylene were found in the groundwater; benzene, toluene, and ethylbenzene (along with several other constituents) were also detected in groundwater in 2006.  PSOF ¶ 5.  Each of these constituents is a CERCLA hazardous substance.  40 C.F.R. § 302.4 (Table 302.4).  The presence of these hazardous substances in groundwater demonstrates there has been a release.  Further, the evidence that landfill gas contained hazardous substances, along with evidence that landfill gas was emitted into the substrata and ambient air, also demonstrates there was a CERCLA release.  PSOF ¶¶ 6-13.  The Court thus finds that there was a release of hazardous substances at the landfill.

### c.  Costs Incurred in Response to the Release

Allied claims that it incurred costs in response to the release, or threatened release, of hazardous materials at the landfill site when it implemented the work required by the Cook County Court's Second Supplemental Order, Emergency Closure Order, and Final Consent Order.  CERCLA "imposes liability upon those responsible for a facility from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance."  *U.S. v P.H. Glatfelter Co.*, 768 F.3d 662, 674 (7th Cir. 2014).  CERCLA defines the term "response" to mean "remove, removal, remedy, and remedial action." 42 U.S.C. § 9601(25).  As previously explained, removal actions include "the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into

the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release." 42 U.S.C. § 9601(23).

The EPA has identified a non-exhaustive list of actions that fall within the definition of a removal action. 40 C.F.R. 300.415(e). That list includes: "(2) Drainage controls, for example, run-off or run-on diversion—where needed to reduce migration of hazardous substances or pollutants or contaminants off-site or to prevent precipitation or run-off from other sources, for example, flooding, from entering the release area from other areas; . . . (4) Capping of contaminated soils or sludges—where needed to reduce migration of hazardous substances or pollutants or contaminants into soil, ground or surface water, or air; . . . [and] (8) Containment, treatment, disposal, or incineration of hazardous materials—where needed to reduce the likelihood of human, animal, or food chain exposure."

Here, the State of Illinois claimed that the release of landfill gas posed a threat to human health and the environment, in part because it was alleged to contain hazardous substances. [238] ¶¶ 14, 35; [237] Ex. V at ¶ 12. The State of Illinois: (1) demanded that CDC investigate and respond to the releases of landfill gas because they posed a threat to human health and the environment, [238] at ¶¶ 14, 35; (2) alleged that the gas may contain hazardous substances, [237] Ex. V at ¶

43

12; and (3) demanded that CDC address the leachate released at the site. [238] at ¶ 14. There is also undisputed evidence that the gas and leachate released from the landfill contained hazardous substances, [238] at ¶¶ 3, 4, 10, and that the landfill odors are caused, in part, by methyl mercaptan – a CERCLA hazardous substance. [222] Ex. M. at 26:17-27:8; 40 C.F.R. § 302.4. Moreover, laboratory analysis showed that the gas and leachate contained hazardous substances. [238] at ¶¶ 3, 4, 10. There is no dispute that gas and leachate were released from the landfill and Allied incurred costs to address those releases.

Gas samples collected in 2007 also indicate that the released gas contained hazardous substances. [238] ¶ 10. The landfill did not complete installation of the final landfill gas collection and treatment system until 2008, after the 2007 gas sampling was conducted. [242] Ex. 3 at ¶¶ 17-18. And, as part of that installation, Allied ensured that the new gas treatment system could adequately treat the hazardous substances in the released gas. [238] at ¶¶ 16-20.

In response to the foregoing, and the Second Supplemental Order in particular, Allied incurred costs executing the following removal actions:

1. Assessing the GCCS and proposing remedies. PSOF ¶ 14. The GCCS included: (a) gas extraction wells (located in the waste fill area); (b) gas interceptor wells (located outside the waste fill area); (c) piping to transport gas to flares; (d) a landfill gas condensate system; (e) the northwest quadrant interim odor control system; and (f) blower-flare stations.

2. Incinerating hazardous air pollutants to comply with Clean Air Act standards and reducing the likelihood of human exposure to those pollutants. PSOF ¶ 20.

3. "[M]onitor[ing], assess[ing], and evaluat[ing] the release or threat of release of hazardous substances" in leachate and landfill gas. PSOF ¶¶ 21-22.

Because assessment and containment are types of removal actions, the costs Allied incurred in performing the above work qualify as response costs.

Further, on March 12, 2007, the Cook County Court entered an Agreed Order for Emergency Engineered Closure. Under that order, the landfill had to:

1. Accelerate the rate of filling so that no solid waste was received after June 15, 2008 and the final landfill cap was installed by December 31, 2008. PSOF ¶ 25.

2. Install the landfill cap, to reduce the migration of hazardous substances into soil, ground or surface water, and air, by preventing leachate generation, helping the GCCS work efficiently and controlling releases of hazardous substances around the landfill perimeter. PSOF ¶¶ 26-27.

Allied also incurred costs implementing work under the Final Consent Order. The FCO required that a Corrective Action Measures Assessment (CAMA) be conducted in accordance with 35 IAC 811.324. PSOF ¶ 28. Since the CAMA is intended to identify a permanent remedy for groundwater impacts, it is more technically classified as a remedial action as opposed to a removal action. Remedial actions are nonetheless "response actions" for purposes of showing that the plaintiff incurred "response costs" in response to a release of hazardous materials. 42 U.S.C. § 9601(25). Thus, the costs incurred to implement the CAMA are properly considered response costs.

In arguing against Allied's incurrence of response costs, the Daniels argue that because the actions Allied took are required under Illinois landfill closure regulations, they cannot be CERCLA response costs. [236] at pp. 12-13. Other

courts have specifically rejected the argument that compliance with state landfill regulations precludes CERCLA liability. *Arizona v. Motorola*, 805 F. Supp. 742, 748 (D. Ariz. 1992); *City of Fresno v. NL Indus., Inc.*, 1995 WL 641983 at *4 n. 1 (E.D. Cal. Jan. 19, 1995). Further, the EPA's Presumptive Remedy for CERCLA Municipal Landfill Sites expects that state and federal landfill closure regulations will govern CERCLA response actions at municipal landfills. [252] Ex. 2.

Additionally, as the Ninth Circuit has explained, as long as the costs were incurred in response to a threat to human health or the environment, and the actions were taken to address that threat, the underlying motivation for incurring costs is irrelevant. *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 872 (9th Cir. 2001) ("we focus not on whether a party has a business or other motive in cleaning up the property, but on whether there is a threat to human health or the environment and whether the response action is addressed to that threat"). Here, it is undisputed that Allied incurred costs in response to the release of hazardous materials and a threat to human health and the environment, and that its response actions addressed that release and threat. [238] ¶¶ 14, 35.

### d. Necessary and Consistent

Allied claims that its response costs were "necessary" and "consistent with the national contingency plan" ("NCP") as required under CERCLA. Although CERCLA does not define the term "necessary," courts in this Circuit have noted that a plaintiff demonstrates that costs are "necessary" by showing that the costs were incurred in response to a threat to human health or the environment, and that

they were necessary to address that threat. *Soo Line R. Co. v. Tang Indus., Inc.*, 998 F. Supp. 889, 895 (N.D. Ill. 1998); *G.J. Leasing Co. v. Union Elec. Co.*, 854 F. Supp. 539, 562 (S.D. Ill. 1994) *aff'd*, 54 F.3d 379 (7th Cir. 1995). Since the state court's orders required Allied to take action to address threats to human health and the environment, and Allied incurred costs implementing those orders, Allied incurred costs to address threats to human health and the environment. Thus, the costs Allied incurred were "necessary."

As far as the response actions being consistent with the NCP, a private cleanup effort is considered "consistent with the NCP" if the action, when evaluated as a whole, is in substantial compliance with the applicable NCP provisions. *Norfolk S. Ry. Co. v. Gee Co.*, No. 98 C 1619, 2002 WL 31163777, at *29 (N.D. Ill. Sept. 30, 2002). Substantial compliance with the NCP can be established by demonstrating a state environmental protection agency's substantial involvement in the cleanup. *NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 791 (7th Cir. 2000). In *NutraSweet*, the Defendant argued that "NutraSweet did not effectively clean up its property, and therefore it violated the EPA's national contingency plan." *Id*. at 790-91. The court disagreed, finding that "the district court did not clearly err in concluding that NutraSweet had satisfied the NCP. The Illinois EPA approved NutraSweet's clean-up plan, and the agency monitored the progress of the remediation. NutraSweet remediated its property until the Illinois EPA advised it that it could stop because NutraSweet's efforts had succeeded to the maximum

extent possible. In light of this evidence, we are satisfied that NutraSweet met this requirement for a CERCLA recovery." *Id*. at 791.

The Northern District of Indiana reached a similar conclusion in *Valbruna Slater Steel Corp. v. Joslyn Manufacturing Co.*, No. 1:10-CV-044, 2015 WL 8055999 at \*6 n.4 (N.D. Ind. Dec. 4, 2015). There, the defendant argued that the plaintiff's costs were not "in substantial compliance with the NCP because [plaintiff] did not conduct a remedial preliminary assessment and site inspection, a remedial investigation/feasibility study or a remedial design/remedial action evaluation." *Id*. The court, citing *NutraSweet*, found that it was "not necessary to determine the extent to which [plaintiff] satisfied those elements of the NCP. That is because demonstrating [Indiana Department of Environmental Management's] substantial involvement in this cleanup is sufficient to establish not merely substantial compliance with the public participation requirement, but substantial compliance with the NCP as a whole." *Id*.; *see also* *Norfolk*, 158 F. Supp. 2d at 882 (finding NCP compliance where "the IEPA was involved in both the approval of [the] remediation plans and the execution of the remediation itself, and then supplied its final stamp of approval by way of two separate No Further Remediation (NFR) Letters"); *City of Gary v. Shafer*, No. 2:07-CV-56-PRC, 2009 WL 1605136, at \*14 (N.D. Ind. June 2, 2009) (the "involvement of a state environmental agency in approving cleanup plans and monitoring remediation progress satisfies the requirement of consistency with the NCP").

The record before this Court shows that the IEPA was sufficiently involved in the clean-up to satisfy CERLA's consistency requirement. For example, in addition to the various "Area Work Plans" described above, Allied – on behalf of CDC – submitted weekly/bi-weekly, monthly, quarterly, and semi-annual progress reports to the State summarizing activities completed, analysis and discussion of data trends, and describing future activities. PSOF ¶ 36. In addition, bi-monthly meetings were held with the State to discuss site response activities. PSOF ¶ 37. Further, the state approved recommended response activities, not only through those meetings, but also when approving significant permit modifications. PSOF ¶ 38. This specific evidence, and the record as a whole, shows a substantial involvement by the IEPA with the clean-up process at the landfill. Thus, Allied has satisfied CERCLA's requirement that clean-up activities are consistent with the NCP.

### e. Responsible Party

Allied further claims that Sexton is a "responsible party" under CERLCA. A CERCLA responsible party includes "any person who at the time of disposal owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2). As previously explained, a CERCLA operator is a person or entity that manages, directs, or conducts operations "specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Bestfoods*, 524 U.S. at 66. Sexton admits that: (1) it operated the CDC Landfill between 1980

and 2007, PSOF ¶ 42; and (2) its operation of the landfill included exercising decision-making control over waste disposal and the landfill's compliance with environmental regulations. PSOF ¶¶ 42-46. Therefore, Sexton qualifies as a CERCLA operator.

In light of the above, Allied's motion for summary judgment on its CERCLA claim is granted with regard to Defendant Sexton.

### ii. Breach of Contract – Count IV

In its motion for summary judgment on Count IV, Allied claims it is entitled to judgment based upon Sexton's breach of the capital contribution requirement in Section 2.01 of the Partnership Agreement. Four elements are required to prove a breach of contract: (1) the existence of a valid and enforceable contract; (2) plaintiff's performance of all required contractual conditions; (3) defendant's breach of the terms of the contract; and (4) damages resulting from the breach. *Hess v. Bresney*, 784 F.3d 1154, 1158-59 (7th Cir. 2015). Allied's motion for summary judgment fails on the fourth element.

In Illinois, in order to prevail on a claim for breach of contract, Allied "bears the burden of proving that [it] sustained damages." *Ollivier v. Alden*, 634 N.E.2d 418, 422 (Ill. App. Ct. 1994); *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 967 (Ill. App. Ct. 2004). Therefore, under Illinois law, it is necessary to show damages—not the specific amount, but rather that the plaintiff did, in fact, suffer some damages. *Transp. & Transit Assocs., Inc. v. Morrison Knudsen Corp.*, 255 F.3d 397, 401 (7th Cir. 2001). Merely showing that a contract has been

breached without demonstrating actual damage does not suffice to state a claim for breach of contract. *Id*.

The measure of damages for breach of contract is the amount that will compensate the aggrieved party for the loss "which either fulfillment of the contract would have prevented or which the breach of it has entailed." *LeFevour v. Howorka*, 224 Ill. App. 3d 428, 430-31 (Ill. App. Ct. 1991). "In determining which measure of damages to use, the trial court must examine the exact interest harmed." G*villo v. Stutz*, 306 Ill. App. 3d 766, 770 (Ill. App. Ct. 1999). "Compensation awarded in a breach of contract action should not provide plaintiff with a windfall." *Walker v. Ridgeview Const. Co.*, 316 Ill. App. 3d 592, 596 (Ill App. Ct. 2000).

Construing the facts and making all reasonable inferences in favor of the non-movant, the Court cannot find that Allied has adequately proven it was damaged as to the contract claim in this matter. Allied argues that if Sexton had "met its obligation to pay half of the NCP consistent costs Allied would have an additional $47.35 million. Instead, because of Sexton's breach, Allied has had to cover Sexton's share of those costs." [229] at 20. While the parties dispute the exact number, it is clear to the Court that Allied did incur some costs as a result of Sexton's breach. However, the record is equally clear that Allied received a greater partnership share in the CDC as a result of paying those costs on Sexton's behalf. From 2007 to 2014, Allied's partnership share grew from 50% to 99.96%. That share growth was – according to the record – commensurate with the capital contributions made by Allied. Partnership Agreement 2.01. In other words, the

share change was meant to compensate Allied for the payments it made without Sexton. The value of that growth in ownership percentage is not clear from the record. To show that it was damaged, however, Allied would need to show that the value of the partnership share it received under the share dilution section of the Agreement was less than the amount it paid in un-matched capital contributions. In other words, it is possible that Allied was damaged by having to pay X million dollars in capital contributions, but also received X million dollars' worth of partnership share. If this were the case, Allied would not have suffered damages. Without evidence as to the value of Allied's increase in partnership share, the Court cannot say – as a matter of law – that Allied suffered damages sufficient to succeed on its breach of contract claim.

Construing all facts and reasonable inferences in the light most favorable to the nonmoving parties, the Court denies Allied's motion for summary judgment on Count IV.

## IV.    Conclusion

In light of the above, the Court rules as follows: (1) Sexton's motion for summary judgment [220] is denied; (2) the Daniels' motion for summary judgment [224] is denied; and (3) Allied's motion for summary judgment [228] is granted as to its CERCLA claim against Sexton, but denied in all other respects.  This matter remains set for a pretrial conference on 6/27/2016 at 1:00 p.m. in Courtroom 1725. Any additional pretrial issues raised by this Opinion shall be addressed at that time.

IT IS SO ORDERED

Dated: June 23, 2016                                        Entered:


                                                           _____
                                                           John Robert Blakey
                                                           United States District Judge